UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


CITIMORTGAGE, INC.,               )
                                  )
        Plaintiff,                )
                                  )
    vs.                           )          Case No. 4:10CV467 CDP
                                  )
OCM BANCORP, INC.,                )
                                  )
        Defendant.                )

## MEMORANDUM AND ORDER

This breach-of-contract dispute arose during the recent financial crisis as a

result of failed investments in the secondary mortgage market.  Plaintiff

Citimortgage Inc. and defendant OCM Bancorp, Inc. purchase and resell mortgage

loans in this market.  In May of 2007 they entered an agreement under which

OCM would, from time to time, sell Citimortgage residential mortgage loans.  The

agreement provided that OCM would have to cure or repurchase defective loans if

Citimortgage, in its sole discretion, determined the loans violated the agreement.

Citimortgage determined that six loans contained material

misrepresentations by the borrowers or otherwise were not in compliance, and it

demanded that OCM cure or repurchase them.  It is undisputed that OCM failed to

do so.  Because the agreement vested sole discretion in Citimortgage to determine

that a loan was defective, OCM can only survive Citimortgage's request for

summary judgment if it can show that Citimortgage made its demand in bad faith. OCM's only evidence of bad faith is some evidence – including an affidavit from its president, Madelina Colon – suggesting that the six loans were not defective.

Although I agree that if OCM could show that there were no defects at all in the six loans that might be sufficient evidence of Citimortgage's bad faith, my review of the loan documents and guidelines reveals that all but one of the loans had defects. An error in claiming only one loan was defective is not sufficient evidence of Citimortgage's bad faith. Accordingly, I will grant summary judgment to Citimortgage on its complaint as to all the loans. I will also deny Citimortgage's motion to strike, because Ms. Colon's affidavit is based on her personal knowledge as president of OCM, and her averments are relevant. This Order granting summary judgment does not dispose of the case, however, because the parties have not sufficiently briefed the issue of the appropriate remedy due Citimortgage. I have thus set a schedule for additional briefing.

## Discussion

### I.    Motion to Strike

Citimortgage moves to strike the affidavit of Ms. Colon, contending it presents irrelevant facts, draws improper legal conclusions, and is not made on personal knowledge. Rule 56(c)(4), Fed. R. Civ. P., provides that an affidavit used to oppose a motion for summary judgment "must be made on personal knowledge,

set forth out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Citimortgage first argues that Ms. Colon's affidavit should be struck because it contains inadmissible and irrelevant facts about the alleged lack of defects in the six loans for which Citimortgage sought repurchase. As I discuss below, however, the issue of whether there were any defects in the loans is relevant to the issue of Citimortgage's good faith in demanding repurchase from OCM, so the affidavit will not be stricken for containing these facts.

Additionally, Ms. Colon avers that her knowledge of the loans' defects or lack thereof is based on her position as President of OCM and her review of OCM's files for each of the six loans. Thus, the affidavit is sufficiently based on Ms. Colon's own personal knowledge to be admissible. Finally, to the extent Ms. Colon's affidavit contains any legal conclusions or relies on impermissible evidence, I have relied instead on the evidence OCM submits in support of its arguments, including the documents it submits regarding each loan. Accordingly, the motion to strike will be denied.

## II.     Motion for Summary Judgment

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the court must view the facts and inferences from the facts in the light most favorable to the nonmoving party.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Caltrett*, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings but must set forth by affidavit or other evidence specific facts showing that a genuine issue of material facts exists. Fed. R. Civ. P. 56(e). At the summary judgment stage, I will not weigh evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue of material fact. *Anderson*, 477 U.S. at 249.

A.      **The Covenant of Good Faith and Fair Dealing**

Under Missouri law,[1] Citimortgage can only prevail on its claim for breach of contract if it proves: (1) the existence of a valid contract between it and OCM; (2) OCM's obligations under the contract; (3) OCM's breach of that obligation; and (4) resulting damages. *See, e.g., C-H Bldg. Assocs., LLC v. Duffey*, 309 S.W. 3d 897, 899 (Mo. Ct. Ap. 2010). Here, OCM does not dispute the existence of the agreement with Citimortgage, or that it had obligations under that agreement.[2]

---

[1] The parties' agreement provides that Missouri law applies to issues over its interpretation.

[2] Citing a recent Missouri Court of Appeals decision, OCM argues that Citimortgage has failed to establish a prima facie breach of contract because it does not cite the specific provisions of the parties' agreement that OCM allegedly breached. This is simply untrue. Citimortgage

Instead, as discussed above, OCM disputes whether it breached its contractual obligations by refusing to cure or repurchase the loans when, it contends, the loans were not defective.

Accordingly, a key dispute in the case is over the proper interpretation of the agreement's "Cure or Repurchase" clause. This provision provides, in relevant part:

**CURE OR REPURCHASE**

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

> (i)  was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loans;

> (ii)  was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan; . . .

> (iv)  must be repurchased from any secondary market investor . . . due to a breach by Correspondent of any

---

cites to the following specific portions: the Cure and Repurchase provision, which required OCM to repurchase or cure any loans that Citimortgage, in its exclusive discretion, determined were defective. And the case cited by OCM does not stand for the proposition that breach-of-contract plaintiffs must cite the specific contractual provisions they allege defendants breached in order to make a prima facie showing. *See C-H Building Associates, LLC v. Duffey*, 309 S.W.3d 897, 899-900 (Mo. Ct. App. 2010) (buyer failed to make prima facie case of seller's breach, because it only submitted evidence that the seller failed to do something not required by the contract).

representation, warranty or covenant contained in this
Agreement or the CMI Manual or a failure by
Correspondent to comply in all material respects with the
applicable CMI Manual terms, conditions, requirements
and procedures . . .

Correspondent will, upon notification by CMI, correct or cure such
defect within the time prescribed by CMI to the full and complete
satisfaction of CMI.  If, after receiving such notice from CMI,
Correspondent is unable to correct or cure such defect within the
prescribed time, Correspondent shall, at CMI's sole discretion, either
(i) repurchase such defective Loan from CMI at the price required by
CMI ("Repurchase Price") or (ii) agree to such other remedies
(including but not limited to additional indemnification and/or refund
of a portion of the Loan purchase price) as CMI may deem
appropriate . . . .

[Exhibit B, #46-2]

In interpreting a contract under Missouri law, a court's primary

consideration is "to ascertain the intent of the parties and then give effect to that

intent." *Lueckenotte v. Lueckenotte*, 34 S.W.3d 387, 395 (Mo. 2001) (en banc)

(internal citations and quotation marks omitted).  If no ambiguities exist in the

contract, the court is to gather the parties' intent from the contract itself, giving the

contract's terms their plan and ordinary meaning.  *Id.*  Here, no one disputes that

the agreement's Cure or Repurchase provision unambiguously gives Citimortgage

sole and exclusive discretion to determine whether loans are defective.  The plain

meaning of the provision's terms gave Citimortgage that discretion: "If CMI, in its

sole and exclusive discretion, determines any Loan purchased pursuant to this

Agreement . . . was underwritten and/originated in violation of any term . . . in this

Agreement . . . . " [Exhibit B, #46-2]. Thus, under the agreement, Citimortgage had the exclusive discretion to determine if a loan was defective for containing material misrepresentations and/or being originated or underwitten in violation of any Citimortgage requirement, and whether OCM had to cure or repurchase such defective loan.

In cases where a contract gives one party discretion to determine issues arising under the contract, Missouri law requires that party to exercise its discretion in good faith, consistent with the covenant of good faith and fair dealing implied in every contract. *See, e.g., Missouri Consol. Health Care Plan v. Cmty. Health Plan*, 81 S.W.3d 34, 48 (Mo. Ct. App. 2002); *see also, e.g., Farmers' Elec. Coop., Inc. v. Missouri Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. 1998) ("Missouri law implies a covenant of good faith and fair dealing in every contract."). "The covenant of good faith and fair dealing encompasses an obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting." *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 370 (Mo. Ct. App. 2008) (internal citation and quotation marks omitted). The covenant does not create a general reasonableness requirement in contracts, however, and it is not enough "to show that a party invested with discretion made an erroneous decision." *BJC Health*

*Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 914 (8th Cir. 2007) (interpreting Missouri law)*; see also, e.g., Schell v. Lifemark Hosps. of Mo.*, 92 S.W.3d 222, 230-31 (Mo. Ct. App. 2002); *Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1112 (8th Cir. 2006) (applying Missouri law). Moreover, it is well settled that there is no breach of the covenant where the parties' agreement expressly permits the actions being challenged, and the party acted in accordance with the agreement. *See St. Joseph*, 251 S.W.3d at 371.

Instead, to establish a breach of the covenant of good faith and fair dealing, there must be evidence that the party with the discretion exercised its discretion in such a way so as to evade the spirit of the transaction or deny the other party the expected benefit of the contract. *See, e.g., BJC*, 478 F.3d at 914; *see also Cordry*, 445 F.3d at 1112 ("When a decision is left to the discretion of one party, the question is not whether the party made an erroneous decision but whether the decision was made in bad faith or was arbitrary or capricious so as to amount to an abuse of discretion.").

Thus, under Missouri law, Citimortgage is entitled to summary judgment because OCM refused to cure or repurchase the loans even if it made a few mistakes in determining whether the loans were defective. A few mistakes would not be sufficient evidence of its bad faith for OCM to defeat summary judgment. *See, e.g., Schell*, 92 S.W.3d at 230-31. Additionally, there can be no bad faith if

Citimortgage simply performed the actions expressly granted it by the parties' agreement, including determining that loans were defective and needed to be repurchased. *See St. Joseph*, 251 S.W.3d at 371. I do agree with OCM, however, that if the evidence showed there were no defects at all in the loans, that could support an inference of bad faith and so a trial would be required. In particular, Missouri courts have held there was sufficient evidence of bad faith for the issue to go before a jury when the circumstances around the party's exercise of discretion indicate that its decision was mere pretext for terminating the parties' agreement, or that the party wished to push costs off onto the other party. *See, e.g., BJC*, 478 F.3d at 915-16; *St. Joseph*, 251 S.W.3d at 370-71.

I conclude, therefore, that OCM could defeat summary judgment by presenting sufficient evidence of no defects at all in the six loans.[3] Similar to the evidence of bad faith in *BJC* – that Columbia used certain calculations without justification and despite facts to the contrary, *see* 478 F.3d at 915-16 – evidence of the lack of any defects in the loans could support the inference that Citimortgage exercised its discretion to demand repurchase in bad faith in order to terminate the contract with OCM, or to push costs of failed loans off onto OCM. While it is true

---

[3]I disagree, however, that any evidence of the general state of the real estate economy in California is probative of Citimortgage's bad faith; none of this evidence is specific to Citimortgage's state of mind. *Compare BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 915 (8th Cir. 2007) (relevant evidence of defendant's bad faith included specific evidence that defendant sought to shed clients like plaintiff).

that the agreement gave Citimortgage sole discretion to demand repurchase if it determined the loans were defective, it did not give Citimortgage exclusive discretion to demand repurchase for no reason at all. *Cf. St. Joseph*, 251 S.W. 3d at 371-72 ("Here, however, the contract did not expressly provide that St. Joseph could impose an additional inspection obligation on the subscribers . . . Nor does the agreement expressly permit St. Joseph to impose excessive costs on the subscribers or arbitrarily impose materially more onerous burdens on the subscribers than it would impose on itself."). Instead, the agreement required Citimortgage to determine first that there was a defect in the loan. Accordingly, I have reviewed below the evidence OCM submits with respect to each loan.

**B.**    **Challenged Loans**

**Santiago Loan**

The evidence reveals that Citimortgage purchased the Santiago loan from OCM on January 22, 2008. In a letter dated January 29, 2009, Citimortgage demanded that OCM cure or repurchase this loan because Citimortgage's independent review of the loan revealed that it contained borrower misrepresentations at the time of origin. In particular, the borrower stated a monthly income of $18,000, but Citimortgage's research revealed that the borrower's average monthly income was $5905.20 in 2007 and $6,167.35 in 2006. Thus, according to Citimortgage's calculations based on this average monthly

income, the borrower's debt-to-income ratio, 107%, exceeded allowable guidelines under the parties' agreement.

OCM responds with evidence suggesting that it complied with all of Citimortgage's underwriting requirements at the time the loan was originated, including the requirement that borrower income not be verified for this type of loan. With this evidence, OCM seems to argue first that the loan was not originated in violation of the parties' agreement, and so was not subject to cure or repurchase. OCM also seems to argue that it could not have detected any buyer misrepresentations at the time of loan origination, because it complied with Citimortgage's guidelines, which did not require income verification. In other words, OCM argues that it did not breach the parties' agreement by selling this loan to Citimortgage, because, even if the borrower significantly misstated his income, Citimortgage's applicable loan guidelines did not require OCM to verify the borrower's income, and so it could not have been aware of any defect when it sold Citimortgage the loan.

This is not a proper interpretation of the parties' agreement. OCM confuses the situations under which Citimortgage could demand repurchase. Rather than only allowing Citimortgage to demand repurchase if OCM originated the loan in violation of the parties' agreement, the agreement's Cure or Repurchase provision also allowed Citimortgage to demand repurchase if the loan contained material

misrepresentations by the borrower and/or underwriter. Specifically, Citimortgage can demand cure or repurchase if it:

> in its sole discretion, determines any Loan . . . (i) was underwritten and/or originated in violation of any term, condition, requirement, or procedure contained in this Agreement or the CMI Manual in effect . . . ; (ii) was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s) . . . .

[Exhibit B, #46-2] Thus, the parties' agreement allowed Citimortgage to demand repurchase in several situations, including if it discovered a borrower's material misrepresentation, or if it determined OCM or its agent originated the loan in violation of Citimortgage's requirements.

Moreover, with respect to the clause allowing Citimortgage to demand repurchase based on a borrower's material misrepresentations, there is no qualifying language indicating, for example, that Citimortgage can only demand repurchase if it determines that OCM knew of the borrower's misrepresentation. The Cure or Repurchase clause by its plain terms allows Citimortgage to demand repurchase at any time if it discovers a borrower's material misrepresentation, even if OCM complied with Citimortgage's guidelines when originating the loan.

Additionally, I agree with Citimortgage that a borrower's substantially misrepresented income would qualify as a material misrepresentation as a matter of law. Under Missouri law, "a misrepresentation is deemed material where it is reasonably calculated to affect the action and conduct of the company in deciding

whether or not to accept the risk by issuing its policy covering the risk."

*Continental Cas. Co. v. Maxwell*, 799 S.W.2d 882, 889 (Mo. Ct. App. 1990)

(internal citation and quotation marks omitted). Although the issue of whether a

misrepresentation is material is generally a question of fact for a jury, there are

some instances where "the materiality of a misrepresentation is so clear that it

should be declared material as a matter of law." *Id.* (concluding that insurer made

material misrepresentations as a matter of law when insured, attorney sued by

client for malpractice, falsely represented on application for professional liability

insurance "the nonexistence of circumstances which could result in a malpractice

claim. . . ").

Here, a potential borrower's income affects the decision of whether or not to

underwrite a loan to that borrower, and, in turn, affects whether Citimortgage will

want to invest in that loan in the secondary loan market. Indeed, as discussed

below, most of Citimortgage's guidelines for underwriting loans involve

verification of either the borrower's income or employment, as well as the

determination of a borrower's income-to-debt ratio. Accordingly, as a matter of

law, a borrower's substantially misrepresented income is a material

misrepresentation, and so Citimortgage's discovery of a borrower's

misrepresented income would entitle it under the parties' agreement to demand

that OCM repurchase the loan for containing material misrepresentations.

OCM contends that Citimortgage has failed to consider Santiago's income from sources other than his employment, including his receipt of rent payments. However, OCM presents no evidence that Santiago ever received such income, and the only other evidence suggests that he did not. Accordingly, there is no evidence of Citimortgage's bad faith in demanding repurchase of this defective loan, and OCM breached the parties' agreement by failing to repurchase it. *See Missouri Consol.*, 81 S.W.3d at 48 (no evidence of bad faith when parties' agreement gave employee group discretion to deny a premium increase, and employee group did exactly that).

Moreover, even if the loan did not contain material misrepresentations, OCM's own evidence reveals that it or its agents failed to originate or underwrite the Santiago loan in compliance with all of Citimortgage's guidelines. The guidelines for a Stated Income Loan provide that the underwriter must verify that the borrower has been employed for at least two years, although the underwriter does not need to verify the amount of any income. According to Citimortgage's Correspondent Manual Program Descriptions, the Stated Income Loan helps "to streamline the amount of documentation needed to secure a mortgage." [Exhibit 2, #54-2] Borrowers applying for a Stated Income Loan may not submit documentation verifying their income, but only need to state it: "**SPECIAL UNDERWRITING CONSIDERATIONS:** *If income is documented in loan file, the*

**loan is no longer eligible for a stated income or no income program**." [Exhibit 2, #54-2, (emphasis in original)]. Thus, the amount of income is not verified, but the underwriter must verify that the borrower has been employed for at least two years: "A full 2-year work history must be verified including prior employment." [Exhibit 2, #54-2] If the borrower had other sources of income, like Santiago, the underwriter must verify that the income existed for at least two years, but need not verify the amount. This evidence is also consistent with Citimortgage's Correspondent Manual for Underwriting, Exhibit 3, #54-3, which provides:

> Although income documents are not required on Stated Income programs . . . the borrower's application must state the specific source of income. Stated Income may be used to calculate debt ratios provided all other factors in the files (e.g., assets, credit information, etc.) appear reasonable and are consistent with the amount being financed.

Accordingly, before approving a Stated Income Loan, the underwriters must "use their knowledge and experience to determine the reasonableness of a borrower's income when evaluating a stated income loan transaction."

OCM verified: Santiago's employment with his listed employer, Four D Professionals, LLC; his involvement in a monthly profit sharing plan with McDonalds Corporation; and his receipt of rental payments from rental properties. OCM was not required to verify the amount of income Santiago received each month, but there is no evidence that OCM complied with the guideline requiring it to verify that Santiago had been employed for two years. The letter from Four D

only indicates that Santiago was currently employed as a Operations Consultant as of December 12, 2007; it says nothing about how long he had worked there. OCM presents no other evidence of any steady employment for Santiago for the years 2005 or 2006. Thus, even though OCM presents evidence that it complied with some guidelines before selling the Santiago loan to Citimortgage, its own evidence reveals that the loan was originated in violation of the parties' agreement.

Accordingly, the undisputed evidence reveals that the Santiago loan contained material misrepresentations and was originated in violation of the parties' agreement. Given these uncontroverted defects, I cannot conclude that Citimortgage demanded repurchase in bad faith. Indeed, it was doing the very thing the parties' agreement explicitly provided that it do. OCM's failure to repurchase or cure the loan on Citimortgage's demand was therefore a breach of the parties' agreement, and Citimortgage is entitled to summary judgment with respect to this loan.

**Saldivar Loan**

Next, Citimortgage presents evidence that it purchased the Saldivar loan from OCM on November 12, 2007. This was also a Stated Income Loan. Similar to the Santiago loan, Citimortgage demanded that OCM cure or repurchase the Saldivar loan in September of 2009, after Citimortgage's own independent research revealed that Saldivar's actual income was misrepresented. Saldivar's

income was actually $667.75 per month in 2007, instead of the $7900 per month she listed on her loan application. Because this difference in income raised the debt-to-income ratio from 40.96% to 484.85%, Citimortgage concluded that the loan was defective for having material misrepresentations from the borrower, and so demanded cure or repurchase by OCM.

OCM does not dispute that Saldivar substantially misrepresented her income; it does not, for instance, present any evidence that Saldivar earned more income in 2007 than Citimortgage's research revealed her to have made. Thus, just as with the Santiago loan, the undisputed evidence of Saldivar's material misrepresentations eviscerates OCM's claim of bad faith. Because the parties' agreement entitled Citimortgage to demand that OCM repurchase this loan, its failure to do so amounts to a breach of the parties' agreement.

OCM again presented some evidence that it complied with Citimortgage's guidelines when originating this loan. Specifically, OCM presents undisputed evidence that it verbally verified Saldivar's employment of four years with her listed employer, consistent with the guidelines for Stated Income Loans. [Colon Affidavit, #54-1, at ¶¶ 35-36; *see also* Exhibit 9, #54-9 ("The credit file contained a verbal verification of employment, dated October 26, 2007, which supported the borrower's tenure as reflected on the loan application.")].[4] There is also evidence

_____

[4]It is undisputed that the guidelines provided for verbal verification of employment.

that the underwriter, after considering other indicators in Saldivar's application, including her credit profile, concluded that Saldivar's stated income was reasonable and consistent with the Citimorgage guidelines for Stated Income Loans.

Even if OCM complied with the underwriting guidelines, however, the parties' agreement entitled Citimortgage to demand repurchase because of a borrower's material misrepresentations alone. OCM's evidence that it complied with Citimortgage's guidelines does not show that Citimortgage acted in bad faith. *Cf. BJC*, 478 F.3d at 914 ("To establish a submissible case of bad faith, then, BJC was required to do more than offer evidence that Columbia's incurred loss determination was flawed or unreasonable."). Because OCM failed to cure or repurchase the Saldivar loan after Citimortgage discovered Saldivar had substantially misstated her income, it breached the parties' agreement, and Citimortgage is entitled to summary judgment with respect to this loan.

**Muchai Loans**

Citimortgage purchased two loans from OCM with Muchai as the borrower: one on December 10, 2007, and the second on December 11, 2007. In a letter dated September 24, 2009, Citimortgage informed OCM that the first of these loans violated the parties' agreement because Citimortgage had discovered that the borrower misrepresented his income. An independent review had revealed that

there were inconsistencies between Muchai's reported income and his W2 and FICA and Medicare withholdings. Considering his correct income, which was $7,515.68 per month instead of the $12,458.33 per month listed on his loan application, Muchai's debt-to-income ratio was actually 73.83% instead of 49.9%. The review also revealed that the underwriter had failed to verify Muchai's employment before closing.

Citimortgage's independent review of the second Muchai loan revealed similar discrepancies between Muchai's reported income and employment and his actual income and employment. In particular, in its demand letter dated March 4, 2010, Citimortgage pointed out that although Muchai had reported employment with Links International for a period of four years earning a salary of $12,458.33 per month, a pay stub submitted as part of his loan application revealed bi-weekly earnings of $5,750 (or a monthly income of $11,500). His medicare and FICA withholdings were also inconsistent with his stated income. Review of Muchai's employment revealed employment at different employers than that listed in his application. Because of these discrepancies, including Muchai's misstated income and employment at the time of application – which was revealed by the very pay stub he included in his application along with his stated income – Citimortgage demanded repayment.

Citimortgage acted in accordance with the parties' agreement in demanding that OCM cure or repurchase these loans. As with the Santiago and Saldivar loans, OCM does not dispute that Muchai's income was incorrectly stated on his loan application. Thus, there is no evidence that Citimortgage exercised bad faith in demanding repurchase, and OCM breached the parties' agreement by failing to repurchase the loan.

Additionally, OCM's own evidence reveals that it did not comply with Citimortgage guidelines when underwriting these loans, so it is undisputed that the loans were also underwritten in violation of the parties' agreement. OCM submits the Citimortgage Correspondent Manual for Non-Agency Alt-A Full Document Loans, which, OCM claims, is the type of loan the Muchai loans were.[5] Unlike the Stated Income Loans, the Full Document Loans require the underwriter to verify the borrower's income amount: the underwriter must verify either employment, or the borrower must provide a "pay stub covering most recent 30 days with YTD earnings noted AND most recent 2-years W2 forms . . . ." [Exhibit 14, #55-3]. OCM alleges that Muchai submitted his pay stub as part of his loan application, pointing to Citimortgage's demand letter, which discusses the pay stub.

---

[5]Citimortgage disputes that the Muchai loans were Non-Agency Alt-A Full Document Loans, but even if I assume that they were, the evidence reveals that OCM failed to comply with the guidelines for Full Document Loans.

The underwriter was required to obtain both a pay stub "AND" W2s from the past two years, and OCM presents no evidence that any W2 was submitted for either loan. OCM also points to evidence that Muchai's credit scores made him eligible for the loans, but the guidelines unambiguously required verification of his income and employment for these loans, and OCM presents no evidence that it complied with either of these requirements. Accordingly, the undisputed evidence reveals that the loan applications for both Muchai loans included substantially misstated monthly incomes, and that the underwriter failed to verify Muchai's employment or to ensure all required documents were in the application. Because these loans violated the parties' agreement, OCM cannot show that Citimortgage acted in bad faith when it demanded cure or repurchase.

### Carreon Loan

In a letter dated February 10, 2010, Citimortgage demanded OCM repurchase the Carreon loan, contending it contained several defects. First, Citimortgage's independent review indicated that the borrower's income was substantially misstated on his loan application. Although Carreon had a listed an income of $4,348.91 per month, Citimortgage's review revealed that he actually earned $3264.44 per month. Second, Citimortgage contended that the underwriter had not accurately verified Carreon's monthly income, because the employment offer letter from Lowe's listing a monthly income of $4348.91 was not sufficient

to show that Carreon actually earned that amount. Citimortgage also discovered several other errors, including that OCM failed to submit several required documents such as the final title policy and a fully executed Amendatory Clause and Real Estate Certificate.

OCM does not dispute that Carreon substantially misrepresented his income. Thus, just as with the Santiago, Saldivar, and Muchai loans, Citimortgage has presented undisputed evidence that Carreon substantially misstated his income in his loan application, entitling Citimortgage to demand repurchase or cure for that reason alone.

Moreover, OCM's own evidence reveals that it failed to comply with Citimortgage guidelines when underwriting the loan. OCM submits evidence, including the guidelines for Carreon's loan, which reveals that the underwriter was required to "verify the borrower's employment for the most recent two full years." [Exhibit 32, #56-8]. However, OCM fails to present any evidence that the underwriter ever verified Carreon's employment or income for the past two years before he applied for the loan. Indeed, OCM's own evidence reveals that the underwriter calculated Carreon's average monthly income based on his income for the year 2007, and for the first eight months of 2008 – instead of the past two full years as required by the guidelines. OCM has failed to submit any evidence of Citimortgage's bad faith in demanding repurchase. Accordingly, OCM breached

the parties' agreement by failing to repurchase the loan upon Citimortgage's demand.[6]

**Albin Loan**

Unlike the other loans, Citimortgage did not discover any borrower misrepresentations in the Albin loan. Instead, Citimortgage claims that several documents were missing from the loan application file, including proof of mortgage insurance at origination, the sales contract addendum verifying the final sales price of $509,956.00, proof of payoff to "GEMB/Polaris Consumer," and proof of acceptable personal funds to close or a CPA letter stating that use of business funds will not affect the company.

OCM responds with evidence, including an affidavit from its President Ms. Colon and other documents evidencing proper payments, suggesting that all of these documents were timely sent to Citimortgage.[7] OCM's evidence is sufficient to create a question of fact as to whether OCM actually submitted those documents along with the loan.

---

[6]OCM has submitted sufficient evidence to create one factual dispute with respect to the Carreon loan, but because it is undisputed that OCM breached the agreement by failing to repurchase this loan, this factual dispute is immaterial and does not defeat summary judgment.

[7]It also suggests that, because Citimortgage did not decline the loan when OCM originally offered it for sale, it was entitled to assume the loan was not defective. That argument is contrary to the unambiguous terms in the parties' agreement: "The failure of either party to exercise any right given to it under this Agreement or to insist on strict compliance of any obligation under this Agreement shall not constitute a waiver of any right . . . . " [Exhibit B, #46-2]

Citimortgage is nevertheless entitled to summary judgment.  It is well established that the covenant of good faith and fair dealing is not breached if the party with discretion simply makes an erroneous decision.  *See, e.g., BJC*, 478 F.3d at 914.  Instead, OCM must submit evidence showing that Citimortgage exercised its discretion to demand repurchase "in such a manner as to evade the sprit of the transaction or so as to deny the other party the expected benefit of the contract."  *Id.* (internal citation, quotation marks, and alterations omitted).  Accordingly, while evidence that *none* of the six challenged loans were defective could support an inference of bad faith, I conclude that evidence suggesting that only one of the loans was not defective is insufficient, especially because there is no other evidence of Citimortgage's bad faith.  All the other loans had defects of some kind – they contained material misrepresentations, and/or they were originated in violation of the parties' agreement.  Additionally, OCM presents no evidence that Citimortgage specifically wished to shed OCM as business partner or to get out of the secondary loan market altogether.  It is undisputed that OCM failed to respond at all to Citimortgage when Citimortgage demanded cure or repurchase.  OCM has failed to present sufficient evidence of Citimortgage's bad faith to survive summary judgment.

### III.    Conclusion and Relief

I conclude that the parties' agreement by its plain terms allowed Citimortgage to demand repayment if it discovered (1) any material misrepresentations by the borrower, including substantially misrepresented income; or (2) that the loan was originated in violation of its guidelines.  Because the undisputed evidence reveals material misrepresentations from the borrowers in the Santiago, Saldivar, Muchai, and Carreon loans, there is no evidence of Citimortgage's bad faith in demanding repurchase.  OCM therefore breached the agreement by failing to repurchase these loans.  Similarly, Citimortgage would also be entitled to summary judgment because the undisputed evidence reveals that the Santiago, Muchai, and Carreon loans were originated in violation of the parties' agreement.  Although there are disputes as to whether there were any defects in the Albin loan, I will still grant Citimortgage summary judgment with respect to this loan, because there is no evidence of its bad faith in demanding repurchase.  Accordingly, I will grant Citimortgage's motion for summary judgment as to all the loans.

In its motion for summary judgment, Citimortgage requests money damages in the total amount of $1,820.576.57, stemming from OCM's failure to repurchase the six loans.  It also requests $42,920.18 in costs and attorney's fees.  However, Citimortgage did not request money damages for the repurchase price of the six

loans in its First Amended Complaint. Instead, it only requested that OCM "perform its obligations under the Agreement, including, but not limited to, repurchase of the defective loans in an amount to be proven at trial . . ." For its part, OCM ignored Citimortgage's request for damages in its opposition to summary judgment. Accordingly, although I agree that Citimortgage is entitled to summary judgment on its complaint for breach of contract, I cannot determine based upon this record what relief Citimortgage is entitled to. I also cannot determine the total amount of money damages, if that is indeed the relief to which Citimortgage is entitled. Finally, I cannot tell whether this issue may be decided on a motion for summary judgment or at trial. I will therefore order Citimortgage to file a motion and memorandum setting out what type of relief it is entitled to – including whether it is entitled to money damages, the total amount thereof, as well as the evidentiary and legal authority supporting its claim – and whether this issue may be decided by motion or by trial. If Citimortgage is seeking summary judgment on its claim for damages, the motion must comply with federal and local rules governing motions for summary judgment, and must contain a proposed form of judgment. OCM shall then file an opposition brief addressing these issues, and Citimortgage may file a reply.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff Citimortgage, Inc.'s motion for summary judgment [#44] is granted.

**IT IS FURTHER ORDERED** that plaintiff Citimortgage, Inc.'s motion to strike [#65] is denied.

**IT IS FURTHER ORDERED** that plaintiff Citimortgage, Inc. shall file its motion and memorandum addressing appropriate relief no later than **May 20, 2011**. Defendant OCM Bancorp, Inc.'s response shall be filed no later than **June 3, 2011**, and any reply brief may be filed by **June 10, 2011**.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 27th day of April, 2011.